Thank you. Good morning, Your Honors. I'm Mark Beatty for Plaintiff Appellant David Brown. Nice to see you again. Again. Who flew in from Louisiana to be with us today. I'd like to reserve eight minutes for rebuttal. Okay. Keep your eye on the clock. Count us down and we'll try to help you. I'm flexible though, Your Honor. Thank you. The U.S. Congress can establish any standing requirement it wants, narrow or broad. In regards to 25 U.S.C. Section 3013 regarding NAGPRA, Congress stated any person alleging a violation. I mean, that's a nice theory and maybe it should be true, but doesn't a Lehigh opinion say absolutely the opposite? You still need an Article III injury. Correct. And I think that's exactly what Bennett v. Speer says is wrong. Bennett v. Speer is an ESA, an ESA Endangered Species Act that has statutory standing. And statutory standing is very clearly different than, I think, Article III standing. Statutory standing says the first question in the present case is whether ESA citizen supervision negates the zone of interest. I'm sorry, but you're just wrong. And it's not going to be useful to go ahead and look at the argument this way. So here's the way in which we would be sort of receptive to your standing argument, which is to say conceding that there's an Article III boundary on standing that Congress can't get past. The argument is that the statutory standing here comports with Article III and that there's injury, impact, causation, and reducibility. And you may win on that argument, but you'll do better if you couch it that way. You have to have Article III standing, so you have to have an injury. Now, just to tell you what I've been thinking about, this is about the NAGPRA. NAGPRA, yes. It's not clear to me that the district judge was right in saying that Congress has any requirement to follow the equitable injunctive requirements so that Congress probably could say, and if you meet Article III standing, you get an injunction, even if you personally, for example, don't have irreparable harm. It seems to me that that would be something a statute could say. I don't know that this statute says this, but it seems to me that your burden, therefore, A, is to show that you have Article III standing, but not necessarily meet the injunction requirements, if you can show that the statute allows an injunction without meeting the usual equitable injunction requirements. And the language of the injunction is just 17 words. The district court shall have the authority to issue such orders as may be necessary to enforce the provisions of this chapter. And I think your response to me, also, I'm simply wrong there, but that seems very, very broad. I have actually more understanding. That is possible. But first you have to show you have Article III standing. So why don't you tell us why you have Article III standing? No, it's possible that you don't, in fact, have to demonstrate, as you ordinarily would, irreparable harm that's going to be incurred by the injunction. Let's hypothesize that for now. But you still need Article III standing. So what's your Article III standing? I believe, in the record, what you have before you. And I believe that the law, then, would be Lejeune. If I remember correctly, it's a wildlife expert who was very interested in whales and was declared to have Article III standing because of his expertise in that area.  I guess what happened here was the district judge's ultimate holding was a little weird because first he said there is Article III standing, I thought, but then he later said that there wasn't standing to get the injunction because your client was no longer an anthropologist in Hawaii. So if he's no longer an anthropologist in Hawaii, what is the Article III standing at all? The confusion that I understood the district court said is that he has standing to bring a case but not to win a case. And under the idea that he is an expert in this area who has decided to practice in this area and the destruction or non-destruction of heiau's in Hawaii Kai or graveyards that Wal-Marts are billed over or 50-plus-year-old courts that aren't properly resourced so they're destroyed when the super ferry comes in. Those are all the subject matter of his profession, his chosen profession. And he would like the subject matter's chosen profession not to be continually destroyed in violation of NAGPRA. But he isn't any longer in Hawaii, right? He's no longer an archaeologist in Hawaii. Presently he's an archaeologist and he's practicing elsewhere. That's not because of choice, that's because there's no opportunities here, which has to do really with his retaliatory firing. He cannot get a job here. He is, unlike at the time of the district court opinion, he isn't employed as an archaeologist someplace. He is employed as an archaeologist and he was employed as an archaeologist at the time of the district court's hiring, but he wasn't practicing in Hawaii in the same way he was when he was the chief archaeologist of the State Historical Preservation. Half of the district court said that there was no record that he was employed as an archaeologist at all. Maybe that's just not in the record, but it was true. I believe there was a time when he was unemployed. But I believe at that time he was employed as an archaeologist and perhaps it wasn't as clear in the record as it should have been. But at that time he was employed as an archaeologist. If we were to remand and you were to amend the record with regard to his current situation and interest in these artifacts and situations in Hawaii, what could you allege as of now? The clearest example is that the inventories that have been made so far do not provide enough information for a descendant to establish a relationship. For example, just say some bones were found in Ahupua'a, which is the triangle from the top of the mountain to the sea, maybe into the sea sometimes. That's not enough to say, oh, that was my ancestor, or to say, hey, these remains were found at a... So one of the things he could allege would be that there still is not compliance with the requirements. What could he allege with regard to his personal interest and involvement with these problems? How it's affecting him now? As a professional involved in that field, that would remove any future possibility if the subject matter of his profession was continually destroyed. In other words, that he continues to be interested in archaeology in Hawaii and he'd like to come back here sometime to be an archaeologist, and it makes it harder. And one thing he could do, but that goes right to the First Amendment retaliation, he could start his own consultation firm. The problem with that is Hawaii is a very small place, and everything has to go through Ship D, and he won't get a fair hearing, so he wouldn't be able to represent his clients because he's still being retaliated against, and part of that retaliation is his inability to find work here. Okay, so it is possible that he could allege some continuing interest in Hawaii? Yes. So that means, so if he did that and if he could get an injunction, then what? One of the problems is there's a fee issue here, but there's a timing problem about it. I would need more information about the fee issue, the timing issue. But as to the issue, Ship D is still lacking in qualified personnel. One injunctive relief was to get his job back, which means he would be back in that exact capacity, and that was also asked in the First Amendment retaliation, which that would, I think, even satisfy Judge Kaye in the standing requirement. Let me ask you this. What consequence, if any, is there from the fact that his employer has changed its practices to try to come into compliance with the statute? Well, one of the requirements is to register in the National Registry, to notify the National Registry so any descendants can come forward if they so choose and establish a relationship. There's other organizations, Bishop State, I think University of Hawaii, who have actually done that. They have noticed in the National Registry. My research, Ship D has never done that. So for the last 21 years, they have disposed of some way of remains, and they have never notified anyone of those relationships. And as I understand the statute, they still have an obligation to remedy that situation. Okay, let me ask you this also in the retaliation. How does your client get around the Supreme Court's Garcetti case? Well, I think there's two interpretations of Garcetti. And one interpretation of Garcetti, I think the district court's interpretation of Garcetti, is that it's wrong, and I need to go to the Supreme Court, and under West Virginia, published in 1943, say you violated the Constitution, and the Supreme Court changed this. Yeah, we're stuck with Garcetti. I understand that. The other interpretation of Garcetti, I think there's, and I quote language from Garcetti here, and the question is, is which world are we talking in? Are we talking in a world where anything he says because he's employed, he's got an employee, there he's not. Well, of course, that's not what Garcetti says. It's a question of whether he says something within the scope of his employment. And I think Marble versus Nickerman, that clarifies that it's never the case that confronting your boss about violations of law is part of your job descriptions. And also, and candidly, of the three types of expression that he used in communicating that there is legal practices going on, I think the most compelling one is he refused to participate. He refused to participate. And the language of refusing to participate in a legal scheme, it's never someone's job to break the law. As a government employee, it's never someone's job to break the law. Okay. Now, you wanted to save eight minutes. We're down to three. So do you want to let the other side speak, and then we'll give you time to respond. Thank you. May it please the Court, my name is William Weinhoff. I'm a Deputy Attorney General, and I represent, in this case, Melanie Chinin, in her individual capacity only. So my colleague, Mr. Kroeger, and I will be splitting our time. My argument and discussion will be restricted to the First Amendment portion of the case. I don't have anything to do with NAGPRA. Okay. And about what's your interest? We have agreed that it would be seven and a half minutes apiece. I would expect that I would be less unless there was a lot of questions from the Court, which I'd be happy to answer. Okay. And I think I can. There was very little discussion in, of course, in the oral argument about the First Amendment part of the case. I feel as though I've briefed it. I know that this Court is, this is an issue that comes up in the Ninth Circuit. We had Ng and Maribel and Freytag and Huppert, in which you were the dissenting judge. So I guess my view of this case, or our view of this case, isn't really at this point so much an Ng case. It's just a summary judgment case. There's nothing in the record that this plaintiff engaged in any speech whatsoever. Well, wouldn't you say you represent, who was it, the director, right? Melanie Chinin. Yes, Your Honor. Or the former director. Right. In her individual capacity. Yes, Your Honor. Is this only on the First Amendment claims? Yes, Your Honor. She wasn't. And all those are, they're retaliation claims, aren't they? Yes, Your Honor. All right. Now, in your first line of defense is what? First line of defense. She never, some of these, some of these supposed First Amendment remarks, she was not even aware of. Well, I would. That's one line of defense. That's one. I wouldn't say that's my first. No, that's one line of defense. That's one line of defense. Yes, Your Honor. Okay. And as to the rest, what? As Judge Fletcher may be indicating in his questioning that they're not actionable under Garcetti? There's actually two types of speech that are at issue. The only thing that there's any evidence in the record for is evidence I put in myself. What happened is, is Mr. Brown, when he first started there, he went and gave a speech to some archaeologists, and then he went to a meeting at which he was sent by us. Those are the only ones that there's evidence for, and we have two arguments with respect to those. First of all, they're wheelhouse, wheelhouse Garcetti. And not only that, but the defendant, the plaintiff admitted that he made them in the course of his employment. That is part of his duties. Right, and he admitted that. What if his duties were, and I'm hypothesizing a little bit, what if his duties were, you make speeches for us, but you've got to make speeches that don't criticize us. Right. Well, that's a good point. And now he makes a speech that's very critical. So what happens to Garcetti in that circumstance? I thought about that with considerable, quite a bit actually, at the district court, and I didn't really think about it again, but I can remember thinking about it at the time, and I'm not sure I really know the answer to that because, you know, you're right. You have somebody that says the only reason you're there is because you're a representative of SHPD and you're supposed to spout the party line. You know, your job is to make your criticisms internally. Right, right. Externally, you can say all kinds of things. Right. But don't take our dirty laundry outside. I guess what I thought, and I ended up thinking on that, is the only reason that you're there, and I think some of your cases talk about that. The only reason that you're there, the only reason that you're in a position to give that speech, is because of your duties, then you have to tow the party line. If you want to go out elsewhere and air your dirty laundry elsewhere as a citizen, you know, like in Freytag. That's not the hypothetical. I understand the hypothetical is he comes there, and maybe it's not so hypothetical. He comes there, he's invited to speak in his official capacity, and he speaks in his official capacity, but he gets up and he says, you know, I'm here as a chief anthropologist, archaeologist, but I have to tell you this place is just a mess. Right. And you can go on, and there's corruption going on, and people are paying other people off, and so on. Right. No, I think, and I think that's what I thought was hypothetical, and my answer to that is you're only there because you're an employee, and you're not there as anything else. So it's got to be part of your job. But that's how it happened, by the way. Is that basically the same as Sabayles? I mean, that's, or he got into a problem because he was critical of the DA? Which one, Your Honor? Sabayles, Garcetti, you know, Garcetti v. Sabayles. He was a deputy calendar deputy that was critical of the practices in the DA's office. While he was actually doing his job, he was doing something that he wasn't authorized to do. So had he done it in some other fashion, it would have been different. But, of course, Garcetti doesn't tell us that much because it was conceded in that case. But if that hypothetical had happened, I think it would have posed an interesting and difficult question. But it didn't happen, number one. And, number two, the other thing is— Why do you say it didn't happen? Because as I read what I can figure out about the facts, it's at least a plausible construction of what happened. Well, because what happens is in the concise statement of facts, Ms. Chenin says that those are the only ones she—that speech, she was sitting there. And at the end of the case, at the end of the speech, she said, And there's no evidence whatsoever that she didn't like it, and that was nine months before he left. And it didn't have anything to do with it. So there's nothing supported in the record. So, Your Honor, I really don't want to take up my colleague's time. I think what is a little more difficult. But other than those two instances, which, you know, were within his job duties and didn't form— didn't have anything whatsoever to do with it, in terms of case or keys or whatever it is, you know, some circumstantial evidence, she knew about this. So there could be circumstantial evidence like proximity in time, but there isn't. So I don't think you could possibly get there even if you got past within his job. With respect to the other speech, I know you asked yourself, What other speech? There's nothing in the record. He says, Well, I said this. And I said, Well, who? Who'd you say it to? And, you know, I'm not going to tell you what I found out below. It's in the complaint. So when I took his deposition, I said, Well, who are you talking about? And he told me, and blah, blah, blah. But there's nothing in the record that tells you what that was. So that's one line of defense, so to speak. You mean the deposition is not in the record? No, it's not. And then the other part of it is Ms. Chenin didn't know about it. She said she didn't know about it. He admits he has not a shred of evidence that she does know about it. So that's keys are all over. You've got to show that you knew about it. It doesn't matter. Right. So I'd be happy to ask questions, but otherwise I'd leave it to my colleague. Okay, you've said just about everything. Thank you, Your Honor. Thank you, Your Honors. May it please the Court. I'm John Trager. I'm also a Deputy Attorney General. I'm representing the state and the individual defendants in their official capacity. And I'm obviously going to depart from my prepared remarks this morning. With regard to the standing issue, of course, the Article III standing is necessary. And if I may clarify what happened. The initial complaint of Planey's position was that he, being an archaeologist, he wanted to be able to study these various artifacts and bones. And so forth. And that would give him standing. And the Court granted it at the motion-to-dismiss level. At the time of the trial, Mr. Brown put into evidence his own curriculum vitae, which the Court analyzed and reached the conclusion in finding of fact number 10, that he was not employed in an archaeological capacity and was not working in any sort of situation which would give rise to a- But it's sort of odd because the opinion still says he should have Article III standing, but he's not entitled to an injunctive relief. Well, I think my understanding of the Court's decision was he was entitled to Article III standing for motion-to-dismiss purposes. It perhaps wasn't as well articulated. But obviously, if he wasn't entitled to injunctive relief, going back at it, looking back on it, he would not be entitled to Article III standing. Well, why does he have a very- I mean, he is suing to get his job back. Yes, ma'am. Now, I understand. Let's assume he loses. But at that point, he is suing to have his job back. So in Lujan terms, I mean, in terms of having an interest in coming, being an archaeologist in Hawaii and working with these artifacts, he certainly had when he brought a major lawsuit and he was trying to get his job back so he can be an archaeologist in Hawaii and work with these artifacts. I see your argument. I don't think that's entirely correct. I believe what the NAGPRA claimed was an add-on, which is really not related to getting his job back. But it's related in that sense in terms of demonstrating that he had a continuing interest in what was going on in Hawaii with the archaeological artifacts. Yes, of course. He's certainly not walking away from Hawaii and the archaeology. At the moment, he didn't have a job, but he was trying to get one pretty hard. He was suing for it. Absolutely. Number one, that's sort of circular, that he was trying to get his job back so that he could do the same. Justice Scalia said in Lujan that saying someday I'm going to go back to some place in the world and I might not see these endangered species isn't good enough. But this seems a whole lot more concrete than that. He had a job. The job involved these artifacts. He lost the job. He wanted it back. Why isn't that good enough? Because at the time of the trial, he was not involved in that kind of work at all. That's a stretch for me in terms of Article III, meaning his profession, his education, this is what he does. He's in Hawaii. He would like to do it. And if he were to get relief under the statute, it might be easier for him to do it. I don't think that Article III demands more than that. Even if I concede that, Your Honor, we still have the basic principles of equity that the Supreme Court has said in eBay versus market exchange that we need to abhor. Those could be overridden by statute, couldn't they? They could be. But what's in the statute that overrides those? Are you agree they could be? I will have to concede that. I'm really not in a position to say that. But the only statute we have is that that's contained in NAGPRA, which is a jurisdictional grant to the district court to have the authority and power to enforce NAGPRA. There is no mandate that it issue orders. There is no mandate that it issue injunctions. Is there any case law that kind of makes it, you know, interprets it like a citizen suit kind of? I've been unable to find any case law on that particular issue. There is some case law on NAGPRA regarding actual repatriation of remains, but I don't think that that's really germane here. Who brought those claims? What kind of person? Do you remember? I believe it was someone who was claiming a right to the remains as opposed to the Army, which had them in its possession at the time. But as far as you know, NAGPRA doesn't have something like a citizen suit provision in it? The statute is what it says, very simply. And it's very brief. It simply is a grant to the district court of jurisdiction. What's disturbing here is that his bringing the suit really does seem to have made a difference. The district court said it made a difference. Yes. He says they still haven't fixed everything up. And he's presented no evidence of that. He had a lot of comments. The district judge never got to that point because the district judge said because of how he was situated, he couldn't get an injunction. He specifically didn't decide whether there was still an ongoing NAGPRA violation. That's correct. But the district judge did say at his conclusion of Law No. 2, footnote 7, and this is his commentary on the evidence, that the plaintiff has suggested numerous means of improving shifty inventories of human remains, consistent with the goals of NAGPRA. However, many of the suggestions, while certainly thoughtful and worthy of consideration, would not appear to be required by law. So I think the district judge did indeed look at that  He specifically did not reach the question of whether there was still something that they hadn't done. And he's saying some of the things he was asking for he wasn't entitled to, but he wasn't saying he wasn't entitled to anything if he had had standing, right? As I understand what the district court said, if he were still an anthropologist, the way he looked at it is if he was still employed as an archaeologist at that moment in Hawaii, then the district court would have gone on to decide whether there was still NAGPRA violations, but he didn't do that. That's correct. Actually, yes, Your Honor, it's correct. So if we were to decide that he could have gotten an injunction, he would have to go back to the district court to decide whether there was anything to enjoin. I think that I would have to concede that based upon the conclusions of law as written, I can't rewrite them. But I think that obviously if you look at the findings You might want to predict that the district court is going to find either that there weren't violations or he's not entitled to an injunction, but that's not where we are at this point. Well, his findings of fact certainly support that, although they're not clear on the final point of whether or not he would be entitled or whether or not there is a violation. He made various findings. As I say, the only findings that he found were a violation, a technical violation of notification to the National Park Service for publication in the Federal Register, which he readily agreed that the SHPD was working with the National Park Service to remedy that. The record is clear that that requirement had only recently come into being. At the time the case was filed, it did not exist. At the time it was first scheduled for trial, it did not exist. It came into being that there was a violation, and our people were working to fix that, and the court recognized that. In fact, the court made findings that the people at National Agra that SHPD was dealing with were the appropriate people, and the court expressed great confidence that that would take care of the situation. As I understand the equitable reasons for granting an injunction, you just don't give one because you find a violation. If things are going to be remedied, it's not necessary. We have to find an irreparable injury. Well, you see the problem with that argument is that usually you get to that stage after you pass the standing test. So if you have standing to bring the claim, the next question is, is your claim any good? Claim for injunctive relief. You have to show irreparable harm, right? But it's something else to sort of transfer that over to the standing, because you haven't shown irreparable harm for an act of injury. You don't have standing to sue under NAGPRA. Your Honor, with all due respect, aren't we engaged in a little bit of a semantic argument here? Because although the trial judge did say he lacked standing, when he made the conclusion of law that he was not entitled to an injunction, the factors that he looked at were, under the Reno Air Racing, the actual basic factors for an injunction, whether he suffered an injury, in fact, whether he was likely to suffer an irreparable harm, whether there was no adequate remedy at law. So even though it may have been referred to as a standing issue, it was, in fact, a finding on the equitable basis for granting an injunction. I take your point. On the other hand, it's hard to read the district judge's findings as injury to him, irreparable injury and so on. Divorced from the judge's understanding as to what constituted injury for Article III, and so if we were to conclude that he's wrong with respect to what constitutes injury for purposes of Article III, he might be rethinking what's injury sufficient for injunctive relief. I can't get into Judge Kaye's mind, Your Honor. But I'm concerned that those ideas might have been mixed in his mind enough that if we say, you know, Article III injury, in fact, has been satisfied, I'm not sure that he wouldn't rethink his conclusion. I'm not sure. What can I say? I was there. I don't think he would, but I have to say that's not the operative issue here. Your point is well made. I have to concede that. I don't think that's where we are. And then you made some objection as to timeliness of appeal of attorney's fees. Is that right? Yes, although that was primarily made by Mr. Weinhoff, and I think I have a few minutes left. But wasn't there also an affirmative claim for fees for the NACPR, which has the same problem? There was no affirmative claim for fees. There was a claim for costs, I believe. Both the plaintiffs had an affirmative claim for fees. They had a claim for costs. I don't recall it was for fees as well. We've actually taken you over, but if you have something else you'd like to say, we won't make it. No, I will rest at this point. Thank you very much. First off, I want to say that if it ever comes to this point, pay attention to the timelines and requirements for appealing attorney's fees. Thank you. The situation and time of trial is the same as here. Mr. Brown has a permit to practice archaeology in Hawai'i. He has an office in Hawai'i. He has a home in Hawai'i. He has a wife in Hawai'i. She's sitting back over there. But he can't do any work in Hawai'i because he blackballed, and that's part of the First Amendment claim. It might be an issue that Judge Kaye didn't think we had equitably stated that in court. You didn't argue irreparable injury in your briefs to us. Did you waive that argument? If I argued it, it's only like maybe 1% of what I argued on that hearing. Did the other side argue that you waived that argument? So maybe they waived the waiver? Okay. Did you, in fact, have an affirmative claim for fees? Yes. You did? Yes. What I wrote a motion for is based on that it made a difference, and I think that's on page 5 of my opening. I said, hey, it made a difference. Thank you so much, Mr. Brown, for bringing the case. You made a difference. And I said, great. By the law I cite on page 5, around there, there's an argument. We want that. And I put an affirmative motion, but it was denied. What is the provision that allows fees? It's the same as my interpretation of the statute. The judge has authority to issue any order. Also, there's inherent authority. There isn't a specific attorney's fees provision that applies? No. And then also costs are by local rule. Okay. But in terms of fees, there is no fee provision? Other than the legal arguments I just put forward. Is this not only a Niagara suit but also a 1983 suit? The motions with the judge was just on the Niagara part. I did not ask for fees on the First Amendment. Well, the reason I ask that is that under Maine v. Thibodeau, any violation of federal law, not restricted to violation of constitutional law, by someone who's a proper defendant under a 1983 suit is a violation of 1983. And 1983 contains within it an attorney's fees provision. Yes, definitely. I agree. Now, did you allege a violation of 1983 in your complaint? The whole First Amendment, that's before the court. I'm not asking that. Pardon? I'm not asking that. Well, NAGPRA is largely the content of what the retaliatory for First Amendment freedom of speech is. Okay. Mr. Weinhoff, I believe very hyperbolic, said no short of evidence. On page 29 of my reply, there's a statement by Mellon Chin that says, I explained that I had received complaints from all of the staff, the private archaeology community, and the Hawaiian community. I'm not quite sure she's telling the truth here, but she goes on and talks about what they said in that. Now, I believe that, and I put in my brief sufficient evidence, that everything she claims is wrong with him is actually, he wasn't doing any of that stuff. But she said that other people came and talked to her. Does she want us to infer that it's in response to these speeches? Yes. But candidly, of the three types of speech to other people, to Chin indirectly, I believe the one that caused him to be fired was that he refused to participate in the illegal schemes by signing off on the colloquial heights and creating a fraudulent document. He refused to do that. And it was just weeks after he refused to sign off on colloquial heights that he was fired. Okay. Thank you very much. Thank both sides. Brown v. Hawaii is now submitted for decision.
judges: Tashima, Fletcher W. , Berzon